**LYNCH CARPENTER, LLP**
Todd D. Carpenter (CA Bar No. 234464)
todd@lcllp.com
(Eddie) Jae K. Kim (CA Bar No. 236805)
ekim@lcllp.com
1350 Columbia Street, Suite 603
San Diego, CA 92101
Tel:  (619) 762-1910
Fax:  (619) 756-6991

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)
jkaliel@kalielgold.com
Sophia Gold (CA Bar No. 307971)
sgold@kalielgold.com
1100 15th Street, NW, 4th Floor
Washington, D.C.  20005
Tel.:  (202) 350-4783

*Attorneys for Plaintiff
and Proposed Class Counsel*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTANY COVELL, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZIONS BANCORPORATION, N.A., and DOES 1-20, inclusive,<br><br>Defendant. | Case No.:  **'22CV516  BAS JLB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Brittany Covell ("Plaintiff") brings this action, on behalf of herself and all persons similarly situated, against Defendant Zions Bancorporation, N.A. ("Zions" or "Defendant"), based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations, and states:

## INTRODUCTION

1.  Plaintiff brings this action on behalf of herself, the general public, and all other similarly situated consumers against Zions, including all of its local brands in the various states where it does business. Zions operates via eight customer-facing brands which often

differ by state. This case challenges Zions' routine practices of assessing an Overdraft Fee ("OD Fee") on transactions that did not actually overdraw checking accounts.

2. Zions' customers have been injured by the Defendant's improper practices to the tune of millions of dollars bilked from their accounts in violation of Zions' clear contractual commitments.

3. Plaintiff, on behalf of herself and a Class of similarly situated consumers, seeks to end Zions' abusive and predatory practices and force it to refund all of these improper charges. Plaintiff asserts a claim for breach of contract, including breach of the covenant of good faith and fair dealing, and seeks damages, restitution, and injunctive relief, as set forth more fully below.

4. While there is nothing unlawful about assessing OD Fees on accounts when such fees are assessed in compliance with contractual terms, OD Fees generally have a crushing impact on persons living paycheck to paycheck. This is why the financial services industry is increasingly moving away from such fees.

5. For example, one of the nation's largest consumer banks, Ally Bank, recently stopped assessing OD Fees altogether. Diane Morais, Ally Bank's president of consumer and commercial banking, said that one reason Ally Bank ceased the practice is because OD Fees disproportionately affect people who are living paycheck to paycheck and that overdraft fees disproportionately affect Black and Latino households. *Overdraft Fees Are Getting the Boot at Ally Financial*, The Wall Street Journal (June 2, 2021), https://www.wsj.com/articles/overdraft-fees-are-getting-the-boot-at-ally-financial-11622631600 (last accessed Aug. 23, 2021).

6. Indeed, Black households and those with low-to-moderate incomes are almost twice as likely to incur OD Fees as white households or those with higher incomes, according to a report from the Financial Health Network, a research firm partly funded by financial institutions.

7. In recognition of the inequitable effects of OD Fees, major banks, such as Bank of America, are reducing OD Fees from $35 to $10. *People Hate Overdraft Fees.*

*Banks are Ditching or Reducing Them,* NPR (Jan. 11, 2022), https://www.npr.org/2022/01/11/1071860136/people-hate-overdraft-fees-capital-one-is-ditching-them-and-other-banks-may-foll (last accessed Feb. 17, 2022).

## PARTIES

8. Plaintiff is a citizen and resident of San Diego, California.

9. The Defendant is a bank holding company headquartered in Salt Lake City, Utah. Zions is the largest bank in Utah with total assets exceeding $80 billion. Zions operates as a national bank doing business under eight local brands: AmegyBank, California Bank & Trust, The Commerce Bank of Oregon, The Commerce Bank of Washington, National Bank of Arizona, Nevada State Bank, VectraBank Colorado, and Zions Bank. The Bank operates in 11 western states: Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Texas, Utah, Washington, and Wyoming. Zions operates over 430 branch offices throughout the western states. The Defendant is publicly traded and has a market capitalization over $10 billion.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class comprise at least 100 members; (2) at least one member of the proposed Class resides outside of Utah; and (3) the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Zions is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

**I. ZIONS CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

12. Plaintiff has a checking account with Defendant.

13. Defendant issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

14. Pursuant to Zions' Deposit Account Agreement ("Deposit Agreement"), attached as Exhibit A hereto, and Personal Service Charge Information ("Fee Schedule"), attached as Exhibit B hereto (collectively, "Account Documents"), Defendant charges fees for transactions that purportedly result in an overdraft of accountholders' checking accounts. Certain contractual provisions only apply in certain states, but the terms relevant to this case are the same for all Zions customers.

15. Plaintiff brings this cause of action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

16. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces an accountholder's checking account by the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds to cover these transactions because Defendant has already sequestered these funds for payment.

17. However, Defendant still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

18. Despite putting aside sufficient available funds for debit card and other point of sale transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

19. Defendant maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a

customer makes a purchase with a debit card, Defendant sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

20. When any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account a balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

21. Still, despite keeping those held funds off-limits for other transactions, Defendant improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions *always* have sufficient available funds to be covered.

22. Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.

> Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

CFPB, Winter 2015 "Supervisory Highlights."

23. There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on these APPSN Transactions.

24. Besides being unfair and unjust, these practices breach contract promises made in Defendant's adhesion contracts—contracts which fail to inform accountholders about the true nature of Defendant's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

25. In plain, clear, and simple language, the Account Documents covering OD Fees promise that Defendant will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

26. In short, Defendant is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

### A. *Mechanics of a Debit Card Transaction*

27. A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

28. At this step, if the transaction is approved, Defendant immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

29. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

30. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

31. Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, Defendant is obligated to pay the transaction. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Defendant may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

32. There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### B. *Defendant's Account Contract*

33. Plaintiff has a checking account with Defendant, which is governed by Defendant's standardized Account Documents.

34. The Deposit Agreement promises that Zions immediately places a hold on debit card transactions at the moment of authorization, and that those held funds are off limits for other, later transactions:

> **Authorization Hold**. When you conduct an Everyday Debit Card Transaction as a Signature-Based Transaction (defined below), the merchant requests that we authorize the transaction. When we authorize a transaction following the merchant's request, we typically note the amount of funds relating to that request by creating an "Authorization Hold" in your account. ***At the time we create the Authorization Hold, the Available Balance for your account is reduced by that amount*** (even though settlement will occur later and we will post the final transaction to your account). The amount of an Authorization Hold may be less than, the same as, or more than the final amount of the signature-based transaction.
>
> **Everyday Debit Card Transaction.** A one-time transaction or purchase in which the cardholder provides their debit card or debit card number to a merchant for payment of goods or services that are not recurring. ***Each payment is normally authorized (confirmed) by you (usually with a PIN or cardholder's signature) at the time of the transaction or purchase.*** We are authorized to rely on the originating bank's or the merchant's coding of the transaction as an Everyday Debit Card Transaction for all purposes, including refusing or paying the charge and assessing the applicable fee if the account has an insufficient Available Balance.

Deposit Agreement, Exh. A, p. 11 (emphasis added).

35. For APPSN Transactions, which are immediately deducted from a positive account balance and should be held aside for payment of that same transaction, there are always funds to cover those transactions—yet Zions assesses OD Fees on them anyway.

36. The above promises mean that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

37. APPSN Transactions are always initiated at a time when there are sufficient available funds in the account.

38. In fact, Zions actually authorizes transactions on positive funds, claims to set those funds aside on hold, but then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

39. All the above representations and contractual promises are untrue. In fact, Zions charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Zions may impose OD Fees on any APPSN Transactions.

40. First, and most fundamentally, Zions charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Zions will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

41. Zions assesses OD Fees on APPSN Transactions that *do* have sufficient funds available to cover them throughout their lifecycle.

42. Zions' practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Zions' actual practice and the contract causes accountholders like Plaintiff to incur more OD Fees than they should.

43. Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

44. Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Zions does when it re-debits the account during a secret batch posting process.

45. In reality, Zions' actual practice is to deduct the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

46. At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Zions cannot then

charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

47. Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Zions does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Zions releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

48. This secret step allows Zions to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Zions specifically set aside money to pay them.

49. This discrepancy between Zions' actual practices and the contract causes accountholders to incur more OD Fees than they should.

50. In sum, there is a huge gap between Zions' practices as described in the Account Documents and Zions' practices in reality.

### C. *Defendant Abuses Contractual Discretion*

51. Defendant's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous Account Documents. In addition, Defendant exploits contractual discretion to the detriment of accountholders when it uses these policies.

52. Defendant uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

53. Defendant uses this contractual discretion unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### D. *Reasonable Accountholders Understand Debit Card/POS Transactions Are Debited Immediately*

54. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate deduction and holding of funds for debit card/POS

transactions. That is because, if funds are immediately debited from the balance and held, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited from the available balance, then they are necessarily available to be applied to the debit card transactions for which they are debited.

55. Defendant was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

56. Defendant knows that many accountholders prefer debit cards for this very reason. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

57. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited Aug. 24, 2021).

58. Further, Consumer Action informs consumers that "[d]ebit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited Aug. 24, 2021).

59. This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States increased by approximately 1.4 million in a recent five year period and, with that increasing ubiquity,

consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

60. Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

61. Defendant was aware of accountholder perception that debit transactions reduce an available balance in a specified order—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### E. Plaintiff's Experience

62. As an example, on August 26, 2020, Plaintiff's available account balance was $98.66. She made three (3) transaction on August 27, 2020, which totaled $88.24. Her available account balance on August 28, 2020, was $10.42 and Plaintiff made a single transaction the same day of $22.05. Plaintiff was then assessed two (2) $36.00 OD Fees, insufficient funds fee—item paid, on August 28 and August 31, 2020, respectively, despite the fact that positive funds were deducted immediately, prior to that day, for the transactions on which Plaintiff was assessed an improper OD Fee.

## CLASS ACTION ALLEGATIONS

63. Definition of the Class: Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated. The Class includes:

> All persons with a Zions checking account in who, within the applicable statute of limitations, were charged a fee on an APPSN Transaction.

The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Zions remedies the conduct complained of herein.

64. Excluded from the Class are Zions and its subsidiaries, affiliates, and any entities in which it has a controlling interest, and each of the officers, directors, immediate family members, legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

65. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a sub-class if necessary before this Court determines whether certification is appropriate.

66. <u>Common Questions of Law and Fact Predominate</u>: The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual Class members because Zions has acted on grounds generally applicable to the Class. Such common legal or factual questions include, but are not limited to:

   a) whether Zions improperly assessed OD Fees on APPSN transactions;

   b) whether the conduct enumerated above violates the parties' contract;

   c) whether any of the conduct enumerated above violates the covenant of good faith and fair dealing; and

   d) the appropriate measure of damages.

67. <u>Numerosity</u>: The members of the proposed Class are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to Zions' records. Zions has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

68. <u>Superiority of Class Action and Risk of Inconsistent or Varying Adjudication</u>: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Zions' unlawful and wrongful conduct. A class action is superior to other available

methods for the fair and efficient adjudication of the present controversy. It is impracticable to bring Class members' individual claims before the Court. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Zions as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

69. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Zions, as described herein.

70. <u>Adequacy of Representation</u>: Plaintiff is a more than an adequate representative of the Class in that Plaintiff has a Zions checking account and has suffered damages as a result of Zions' contract violations and Zions' violations of the covenant of good faith and fair dealing. In addition:

    a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel

experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

  b) there is no conflict of interest between Plaintiff and the unnamed members of the Class;

  c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

  d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal demands associated with this type of litigation.

71. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

72. Zions has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

73. All conditions precedent to bringing this action have been satisfied and/or waived.

## FIRST CAUSE OF ACTION

**(Breach of Contract, including Breach of the Covenant of Good Faith and Fair Dealing on behalf of Plaintiff and the Class)**

74. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

75. Plaintiff and Zions contracted for checking account services, as embodied in the Deposit Agreement and Fee Schedule.

76. Defendant mischaracterized in the Account Documents its true OD Fee practices and breached the express terms of the Account Documents.

77. No contract provision authorizes Defendant to charge an OD Fee on an APPSN Transaction.

78. A covenant of good faith and fair dealing is implied in contracts between financial institutions and their members as a matter of state law in nearly every state.

Moreover, the UCC mandates good faith and fair dealing in all banking contracts. The covenant of good faith and fair dealing constrains Zions' discretion to exercise self-granted contractual powers

79. This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

80. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

81. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes her conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

82. Defendant has breached its contracts with Plaintiff and the Class through its OD Fee policies and practices as alleged herein.

83. Zions breached the covenant of good faith and fair dealing through its OD Fee policies and practices as explained herein.

84. Plaintiff and members of the putative Class have performed all of their obligations pursuant to the Defendant's agreements.

85. Plaintiff and members of the putative Class have sustained monetary damages as a result of each of Defendant's breaches.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Class, appointing the Plaintiff as representative of the Class, and appointing counsel for Plaintiff as counsel for the Class;

B. Declaring that Zions' policies and practices as described herein constitute a breach of contract and a breach of the covenant of good faith and fair dealing;

C. Enjoining Zions from the wrongful conduct as described herein;

D. Awarding restitution of all fees at issue paid to Zions by Plaintiff and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

E. Compelling disgorgement of the ill-gotten gains derived by Zions from its misconduct;

F. Awarding actual and/or compensatory damages in an amount according to proof (including twice the amount of usurious interest paid);

G. Awarding pre-judgment interest at the maximum rate permitted by applicable law;

H. Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

I. Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: April 14, 2022            **LYNCH CARPENTER, LLP**

By: */s/Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1350 Columbia St., Ste. 603
San Diego, CA 92101
Tel.: (619) 762-1900
Fax: (619) 756-6991

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)
jkaliel@kalielgold.com
Sophia Gold (CA Bar No. 307971)
sgold@kalielgold.com
1100 15th Street, NW, 4th Floor
Washington, D.C. 20005
Tel.: (202) 350-4783

*Attorneys for Plaintiff
and Proposed Class Counsel*